William H. MATTHEWS

v.

COMPANIA ANONIMA VENEZOLANO de NAVEGACION

v.

J. P. FLORIO & CO., Inc., Third-Party Respondent.

No. 4540.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 30, 1964.

---

J. O. Weilbaecher III, Louis P. Trent, Lillian M. Cohen, New Orleans, La., for plaintiff.

Leon Sarpy, Paul Nalty, New Orleans, La., for respondent.

A. R. Christovich, Jr., New Orleans, La., for J. P. Florio & Co., Inc., and American Mut. Liability Ins. Co.

CHRISTENBERRY, Chief Judge.

This matter came on to be heard by the Court on a former day on motion of respondent Compania Anonima Venezolano de Navegacion, for rehearing from the findings of fact and conclusions of law signed June 30, 1964 and filed of record July 2, 1964, and after due consideration of the evidence, briefs and argument of counsel submitted to the Court at the trial of this cause as well as arguments and briefs on the hearing of the present motion, the Court makes the following findings of fact and conclusions of law, amending the original findings and conclusions signed June 30, 1964, and filed of record July 2, 1964, to the extent that they are inconsistent herewith.

## FINDINGS OF FACT

### I.

Compania Anonima Venezolano de Navegacion was at all times mentioned herein the owner and operator of the SS RIO ORINOCO, which vessel on October 18, 1959, lay afloat alongside the Third Street Wharf in the Mississippi River at the Port of New Orleans within the territorial jurisdiction of this Court.

Libellant, William H. Matthews, was at the pertinent times mentioned herein a resident of the Parish of Orleans, State of Louisiana, and on the day in question was working aboard the SS RIO ORINOCO as a longshoreman, all in the course and scope of his employment with J. P. Florio & Company, Inc., a stevedoring company.

### II.

The libellant was engaged in the stowage of cargo in one of the hatches of said vessel.

### III.

Libellant and his co-workers found, upon the removal of the hatch covers, a large quantity of loose dunnage which had come into port with the vessel. This dunnage was piled unevenly and loosely, about 2 feet to 4 feet high, and covered over with brown paper.

### IV.

Libellant and his co-workers requested that the dunnage be removed. These requests were transmitted by Florio employees to the vessel's mate in charge of stowing cargo. The mate ordered that the dunnage remain in the hold, and that libellant and his co-workers build up cargo to the height of the dunnage and work over it. They were further ordered to build up to the height of the dunnage in the square of the hatch.

### V.

Libellant was required to stow cargo over the loosely piled paper covered dunnage, and to do so it was necessary that libellant walk over the paper covered dunnage. Libellant was unable to stow cargo as ordered without walking over and on the dunnage.

### VI.

While libellant and a co-worker carried cargo for stowage over the covered dunnage, as ordered, libellant's right foot and part of his right leg went through the paper covering into a concealed hole or separation in the loose dunnage. The hole or separation into which libellant fell was created by the loosely piled condition of the dunnage, was covered by paper, could not be seen by libellant, and constituted a trap.

### VII.

Loosely piled and covered dunnage must be removed before stowage of cargo to assure a safe footing for longshoremen.

### VIII.

Eight witnesses and the libellant testified to the above facts, and not one witness contradicted their testimony.

### IX.

A qualified expert on seamanship testified without contradiction that the method employed by the respondent herein on the date of libellant's injury was unsafe.

### X.

J. P. Florio & Co. Inc. did not cause the condition that resulted in the accident and injury, and had no control over the vessel, the dunnage or paper covering over the dunnage, prior to the accident and injury.

### XI.

■ The presence of the loose, covered dunnage in the hold during loading operations, for which the vessel alone was responsible, rendered the vessel unseaworthy, and created an unsafe place for libellant to work. Libellant was injured as a proximate result of such unseaworthiness and unsafe condition.

### XII.

The unseaworthiness of the vessel and the failure of the respondent to provide libellant with a reasonably safe place to work were the sole and exclusive legal causes of the accident and libellant's resulting injury, no negligence being legally attributable to libellant.

### XIII.

■ As a result of the fall, libellant sustained a herniated nucleus pulposus with attendant disability, pain and discomfort of his back and leg. He was hospitalized on two occasions, namely: March 10, 1960, through March 21, 1960, for a Lumbar Laminectomy performed by Dr. Howard Karr; June 15, 1961, through June 22, 1961, for a Lumbar Laminectomy performed by Dr. Byron Unkauf. Libellant also received two myelograms.

In addition to the laminectomies and the myelograms, libellant received conservative treatment from several doctors from October, 1959, to May, 1961, and was seen by one of these doctors a total of 118 times for both conservative treatment and surgery.

### XIV.

From the date of injury to the date of trial, a period of approximately four years, libellant experienced back pain and has been unable to pursue his occupation as a longshoreman.

### XV.

Libellant has reached maximum recovery and has a 35% to 50% total bodily disability, attributable to injuries he received in the fall he sustained on October 18, 1959. Libellant must continue to wear a corset at all times, must sleep on bed boards, and take oral medication to relieve pain.

### XVI.

The bodily disability of the libellant will permanently prevent him from performing the work of a longshoreman. He requires a spinal fusion to stabilize his back, necessitating future pain and suffering as well as hospitalization with its attendant costs, and complete loss of income during such hospitalization and during convalescence.

### XVII.

At the time of the accident, libellant was 36 years of age, with a life expectancy of 31.07 years, as computed by the American Experience Mortality Table (LSA–R.S. 47:2405).

### XVIII.

As of the date of the trial libellant was 40 years of age, with a life expectancy of 27.29 years, as computed by the 1949–1951 U. S. Life Table for non-whites male published by the U. S. Department of Health, Education & Welfare from the 1950 census.

### XIX.

Libellant's earning capacity averaged $445.72 per month for the three-year period prior to date of injury, and since the date of the accident, hourly wage rates for longshoremen have increased.

### XX.

Libellant's medical expenses incurred but unpaid, from date of the injury to date of trial, amount to $276.00.

## XXI.

Since the date of his injury, libellant has earned $5,893.00 while employed as a chauffeur.

## XXII.

It has been stipulated by the parties that to the time of trial, October 30, 1963, Mutual Liability Insurance Company had paid compensation to libellant in the amount of $8,749.08, had paid medical expenses in behalf of libellant in the amount of $2,453.41, and that compensation payments were continuing.

## XXIII.

Libellant is entitled to a decree in his favor and against respondent Compania Anonima Venezolano for the following:

| | | |
|---|---|---|
| Loss of past earnings from date of accident October 18, 1959, to date of trial October 30, 1963,—4 years and 2 weeks—48½ months, at $445.72– | $21,617.42 | |
| Less actual earnings | – 5,893.00 | |
| | $15,724.42 | |
| Less compensation paid by Mutual Liability Ins. Co. for which it is entitled to be reimbursed | – 8,749.08 | |
| | $ 6,975.34 | $ 6,975.34 |
| Loss of future earnings less any amount of compensation paid by Mutual Liability Ins. Co. since date of trial | – | 40,000.00 |
| Past and future pain and suffering | – | 10,000.00 |
| Permanent partial disability | – | 5,000.00 |
| Medical expenses | – | 276.00 |

Intervenor Mutual Liability Insurance Company is entitled to a decree in its favor for all compensation and medical expenses paid by it.

---

## CONCLUSIONS OF LAW

### I.

This Court has jurisdiction over the parties and the subject matter herein.

### II.

■ The warranty of seaworthiness applies to longshoremen, such as libellant, who perform aboard vessels the duties traditionally performed by seamen. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Seas Shipping Co. Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.

### III.

■ To these workers is owed the nondelegable duty to provide a reasonably safe place to work, as well as reasonably safe appliances with which to perform the work. Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S. Ct. 455, 88 L.Ed. 561.

### IV.

This duty cannot be contracted away by requiring the shoreside contractor to supply the men and the equipment. Alaska Steamship Co. v. Petterson, 347

U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798: nor can it be avoided by abandoning part of the vessel to such contractors. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 427, 79 S.Ct. 445, 3 L. Ed.2d 413.

## V.

The use of a firm and safe walkway was a necessary implement to the seaworthy stowage of cargo in the hatch of the SS RIO ORINCO, and the failure on the part of the vessel owner to supply a firm and a safe walkway was the proximate cause of libellant's accident. Ryan Stevedoring Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133.

## VI.

■ The loosely stacked, paper covered dunnage over which libellant was ordered to work, became as much a part of the vessel's deck for continued prosecution of the work as though it had permanently been fixed in place. Grillea v. U. S. (C.A. 2nd 1956), 232 F.2d 919, 922, 923.

## VII.

■■ Respondent's legal responsibility to libellant is not limited to that of furnishing a seaworthy vessel, for there exists on the part of a vessel owner the duty of providing those on the vessel in furtherance of the ship's business with a safe place to work. Pope & Talbot v. Hawn, supra.

## VIII.

■ By allowing libellant to continue loading over the dunnage, respondent failed in its duty to provide him with a safe place to work. See Anderson v. Lorentzen (C.A. 3rd 1947), 160 F.2d 173; Palazzolo v. Pan-Atlantic Steamship Corp. (C.A. 2d 1954), 211 F.2d 277; Crumady v. The Joachim Hendrik Fisser, supra; William v. Lehigh Valley Railroad Co. (S.D.N.Y., 1957), 151 F. Supp. 809.

## IX.

The vessel was unseaworthy and respondent failed in its duty to provide libellant with a safe place to work. Accordingly, libellant is due damages because of his injuries.

## X.

■ Under usual circumstances, where a longshoreman is injured as a result of an unseaworthy or unsafe condition of a vessel which is either created by or actually or constructively known to the stevedoring company, the stevedoring company may be held to have breached its implied warranty and to be liable to the shipowner for injuries resulting from such condition. Calderola v. Cunard Steamship Company, 279 F.2d 475 (2d Cir. 1960), cert. denied, 364 U.S. 884, 81 S.Ct. 172, 5 L.Ed.2d 104.

## XI.

■ However, in cases where the defective or unsafe condition, shown to have existed prior to the commencement of the stevedoring services, is brought to the attention of a ship's officer who not only refuses to correct the defective condition but undertakes to order the method of loading (Paragraph IV, Findings of Fact), the stevedoring company, having been superseded in its obligation by the officer's order, cannot be held liable to the shipowner for injuries sustained by its employee by reason of the defect.

## XII.

The Stevedoring Company's insurer is due reimbursement out of any award made to the libellant of compensation and medical payments made by it to the libellant.

## XIV.

The parties will prepare and present a proper decree.